UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CLIFTON SANDIFER, et al.,       )
                                  )
              Plaintiffs     )
                                  )
          vs.                )     CAUSE NO. 2:07-CV-443 RM
                                  )
UNITED STATES STEEL CORP.,    )
                                  )
             Defendant    )

## OPINION and ORDER

Plaintiffs, current or past employees at United States Steel's Gary Works, allege that they work or have worked numerous pre-shift, post-shift, and other hours in excess of forty hours per week for which they haven't been paid overtime compensation, that USS doesn't provide them with an itemized statement of the total hours worked each pay period, and that USS doesn't maintain proper records of hours worked by employees, all in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* The plaintiffs allege in their complaint [filed December 21, 2007, docket # 1] that they are entitled to overtime compensation for a variety of activities performed on and off the job site. They bring their claims individually and as part of a collective action under 29 U.S.C. § 216(b) on behalf of other similarly situated individually currently or formerly employed by USS.[1] The

---

[1] Magistrate Judge Cherry stayed briefing on the plaintiffs' motion to certify class [docket # 32] on March 28, 2008 [docket # 34] pending the court's ruling on the defendant's summary judgment motion.

plaintiffs seek liquidated damages (or, alternatively, interest), overtime compensation, attorneys fees, and costs.

The case is before the court on USS's summary judgment motion, in which the company argues that various provisions of the parties' labor agreements and the Fair Labor Standards Act bar the plaintiffs' claims. A hearing was held on the summary judgment motion on June 1, 2009. Based on the parties' oral arguments and written submissions, the court grants in part and denies in part the defendant's motion.

## I. BACKGROUND

Some 5,000 people are employed at USS's Gary Works plant where steel is produced and finished. Five hundred employees work in management or as non-union clerical workers. The rest are union-workers represented by the United Steelworkers of America: production and maintenance workers in the Coke and Chemical Division, Iron Producing Division, Steel Producing North Division, Steel Producing South Division, and Operations Services Division are members of Local 1014; production and maintenance workers in the finishing operations (Hot Rolling Division, Sheet Products Division, and Tin Products Division) are members of Local 1066. The plaintiffs are current or former employees of USS and current or former members of the Steelworkers Union.

### A.  Collective Bargaining Agreements

The USS/USWA collective bargaining agreements (CBA) applicable to the issues before the court are the 2003 CBA, effective from May 20, 2003 to September 1, 2008, and the 2008 CBA, a four-year contract that became effective on September 9, 2008. Those CBAs contain the terms and conditions for the production and maintenance workers at all of USS's domestic steel producing facilities, including the Gary Works.

### B.  Daily Activities of Employees

Gary Works plant employees enter the facility through any of seven entrances located at various places across the length of the plant. Employees park their cars in company parking lots, walk to a gate entrance, enter the premises via a personal swipe card, and proceed to their assigned work location or to one of several locker rooms and then to their assigned work location.

USS employees have access to personal lockers and locker room facilities at the plant where they can store their belongings and change into and out of their work clothes. Coke Plant workers use lockers that are partitioned so employees' work and street clothes can be stored separately. OSHA regulations require that items worn in the Coke Plant not be removed from the locker room area except in a closed container, so USS contracts for the removal and laundering of those garments. The locker rooms also include shower facilities. Employees holding positions in the Coke Plant are required to shower at the end of their shift and,

3

under the CBAs, are afforded time to do so[2]; employees who aren't required to shower at the end of their shift may do so if they choose.

USS provides protective clothing and equipment (PPE) for all employees. Such items include flame-retardant jackets and pants ("greens"), safety glasses, a hard hat, protective footwear (steel-toed shoes with metatarsal guards), gloves, hearing protection, snoods, spats, leggings, and/or wristlets. Protective gloves and hearing devices generally aren't donned before the start of the shift, but are put on once the employee arrives at the work site. The specific items of PPE worn by an individual employee depends on the requirements of an employee's job assignment. Other specialized items, such as respirators, aluminized suits, chemical suits, and welders hoods, are kept and put on as needed at job locations. All of the PPE items just mentioned are purchased, maintained, and laundered by USS (or its vendors), are available for employees' use only at the plant, and may not be removed from the plant.

The parties agree that workers must arrive at the plant before the start of their shift so they can put on their PPE and arrive at their work stations by the time the shift officially begins. Paid shifts begin when the person arrives at the assigned work station to begin work, and paid shifts end "eight hours later or, if

---

[2] USS says the 2003 CBA and local agreements and practices at the Gary Works Plant permitted Coke Plant employees to leave their work stations fifteen to twenty minutes before the end of their shifts for wash-up time, provided that the requirements of the pushing schedule and other production needs had been met. Kolb Dec., ¶ 52 [Deft. App. 21]. The 2008 CBA Letter Agreement provides Coke Plant employees with twenty minutes of wash-up time prior to the end of their shift. Deft. App. 392.

4

overtime is worked, when the employee actually stops working." [Deft. Stmt. of Material Facts, ¶ 24.] Time employees spend in pre- and post-shift donning, doffing, walking, showering (with the exception of Coke plant employees), and laundering personal clothing — time the plaintiffs say averages nine to ten hours per week — is unpaid. At issue is whether Gary Works employees should be compensated for those pre- and post-shift hours.[3]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must construe the evidence and all inferences that reasonably can be drawn from the evidence in the light most favorable to the non-moving party, here, the plaintiffs. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

---

[3] The plaintiffs appear to claim in their Supplemental Citation [docket # 150] addressing the decision in Andrako v. United States Steel, 632 F. Supp. 2d 398 (W.D. Pa. 2009), that they have advanced a claim that they were required to attend pre- and post-shift safety briefings without compensation, but neither the complaint nor the summary judgment record contains any such claim. The plaintiffs state in their summary judgment response that "[s]upervisors require employees to be at safety meetings, or at their work station, ready to begin work at the time their shift begins with all of their PPE donned and secured." Stmt. of Genuine Issues of Fact, at 4; Resp., at 8. The plaintiffs can't use their Supplemental Citation to amend their complaint or supplement the summary judgment record, cf. Burks v. Wisconsin Dep't of Transp., 464 F.3d 744, 758 n.15 (7th Cir. 2006) (plaintiff's claim "could be disregarded because Ms. Burks did not plead such a claim, nor did she amend her complaint to include it"); Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."), so the issue of attending pre- and post-shift safety meetings without compensation isn't properly before the court and won't be addressed.

"Summary judgment for a defendant is appropriate when a plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his or her] case on which [he or she] will bear the burden of proof at trial.'" <u>Johnson v. ExxonMobil Corp.</u>, 426 F.3d 887, 892 (7th Cir. 2005) (*quoting* <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 805-806 (1999)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 251-252. The proper inquiry, then, is "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." <u>Springer v. Durflinger</u>, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation and citation omitted).


## III.  DISCUSSION

Enacted in 1938, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, guarantees "compensation for all work or employment engaged in by employees covered by the Act." <u>Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123</u>, 321 U.S. 590, 602 (1944). The FLSA requires employers to pay their employees "a wage for all of the 'work' that they do," <u>Spoerle v. Kraft Foods Global, Inc.</u>, 527 F. Supp. 2d 860, 862 (W.D. Wis. 2007) (*citing* 29 U.S.C. §§ 206, 207), and to pay them one

and a half times their hourly wage for every hour that they work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA doesn't define "work," but that term has been broadly construed to include "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tennessee Coal v. Muscoda, 321 U.S. at 598; *see also* 29 C.F.R. § 790.6(a) & (b) (a "workday" is "roughly described as the period 'from whistle to whistle,'" which includes all time within "the period between the commencement and completion" of an employee's principal activities, regardless of whether employee engages in work throughout the entire period).

Certain provisions of the FLSA were amended in 1947 by the Portal-to-Portal Act, 29 U.S.C. §§ 251-262, which exempts employers from compensating employees for (1) time spent walking, riding, or traveling to and from the actual place of performance of the principal activity the employee is employed to perform, and (2) engaging in preliminary or postliminary activities if those actions occur either prior to the time the employee starts engaging in "principal activities" or after the employee stops engaging in "principal activities" on any particular workday. 29 U.S.C. § 254(a). A "principal activity" is "an integral and indispensable part of the principal activities for which covered workmen are employed." Steiner v. Mitchell, 350 U.S. 247, 256 (1956); *see also* 29 C.F.R. § 270.8(a) ("[I]n order for an activity to be a 'principal' activity, it need not be predominant in some way over all other activities engaged in by the employee in

performing his job; rather, an employee may, for purposes of the Portal-to-Portal Act, be engaged in several 'principal' activities during the workday. The 'principal' activities referred to in the statute are activities which the employee is 'employed to perform.'" (footnote omitted)).

The FLSA was amended again in 1949 by the addition of Section 3(o), which provides that in determining the hours for which an employee is employed, "there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to a particular employee." 29 U.S.C. § 203(o).

USS maintains its employment practices don't violate the FLSA, and the company has moved for summary judgment on the claims of the plaintiffs' complaint. USS says the plaintiffs aren't entitled to the relief they seek because (I) the additional compensation sought is barred by language of the CBAs; (ii) overtime compensation for donning, doffing, and washing is barred by 29 U.S.C. § 203(o); (iii) the activities at issue are activities not compensable under 29 U.S.C. § 254(a); (iv) time spent donning, doffing, and washing is *de minimis* and therefore not compensable; and (v) plaintiffs didn't seek relief through the mandatory grievance and arbitration procedures of the CBA.

The plaintiffs dispute USS's summary judgment arguments. The plaintiffs contend the issue of compensation for pre- and post-shift activities isn't addressed

8

by the express terms of the applicable CBA and genuine issues of material fact exist as to whether they are entitled to over-time compensation for reporting to work before their paid shift begins, donning and doffing protective clothing and safety equipment in the company locker rooms before and after their paid shifts begin and end, traveling to their assigned work stations within the plant before their paid shifts begin, traveling from their assigned work stations to the company locker rooms after their paid shifts end, showering at the work site after their paid shifts end, and transporting and laundering contaminated clothing away from the work place while off duty.[4] The plaintiffs maintain they are entitled to be paid for time spent on those activities and USS has engaged in illegal pay practices by not compensating them for the many hours of pre- and post-shift work they perform on a daily and weekly basis.

### A.  29 U.S.C. § 203(o)

USS says the plaintiffs are not entitled to the relief they seek based on 29 U.S.C. § 203(o) and the language of the applicable CBAs. Under Section 203(o), time spent by employees in pre- and post-shift donning and doffing of PPE and showering is excluded from the computation of hours worked if two conditions are met: first, the activities at issue constitute "changing clothes" as that term is used

---

[4] In May 2008, the plaintiffs sought to bring an additional claim for overtime compensation relating to "buddy relief," but they didn't file an amended complaint containing that claim as directed by Magistrate Judge Cherry in his June 19, 2008 Order [docket # 91]. Therefore, the plaintiffs' "buddy relief" claim is not properly before the court.

in the statute, and, second, a bona fide collective bargaining agreement excludes, by its express terms or by a custom or practice under the agreement, time spent changing clothes and washing from compensable working time. Kassa v. Kerry, Inc., 487 F. Supp. 2d 1063, 1065 (D. Minn. 2007). The burden is on USS to establish that the time spent on those activities should be excluded from plaintiffs' compensation. Davis v. Charoen Pokphand (USA), Inc., 302 F. Supp. 2d 1314, 1320 (M.D. Ala. 2004); cf. Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 869 (7th Cir. 2008) ("The burden is on CCS to establish that an employee falls within the FLSA's administrative exemption."); Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 370 (7th Cir. 2005) ("It is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements."). USS maintains it can establish both elements.

### 1.  Changing Clothes

#### (a) "Clothes"

USS contends the PPE worn by employees at the Gary Works plant constitutes "clothes" as that term is used in 29 U.S.C. § 203(o). USS relies on WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 428 (1986), which defines "clothes" as "clothing," which, in turn, is defined as "covering for the human body or garments in general: all the garments and accessories worn by a person at any one time." USS maintains "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary,

10

contemporary, common meaning." <u>Alabama Tissue Ctr. of the Univ. of Alabama Health Serv. Found., P.C. v. Sullivan</u>, 975 F.2d 373, 378 (7th Cir. 1992). USS says giving the word "clothes" its ordinary meaning finds support in decisions like <u>Anderson v. Cagle's, Inc.</u>, 488 F.3d 945, 955-956 (11th Cir. 2007); <u>Kassa v. Kerry, Inc.</u>, 487 F. Supp. 2d 1063, 1066-1067 (D. Minn. 2007); and <u>Davis v. Charoen Pokphand (USA), Inc.</u>, 302 F. Supp. 2d 1314, 1321-1322 (M.D. Ala. 2004), and in the Department of Labor's construction of § 203(o) in the agency's June 6, 2002 Opinion Letter.[5] USS insists that even though courts don't all agree on the proper definition for the term "clothes" in this context, "the language of Section 203(o) [is] clear and unambiguous [and] a rational examination of the items at issue here reveals them to be what they are: 'clothes.'" Deft. Memo., at 12.

The plaintiffs urge the court to find that use of the phrase "changing clothes" in Section 203(o) "is most sensibly construed to refer to the act of exchanging one set of ordinary clothing for another, such as a uniform or work clothes," and thus doesn't include their donning and doffing of PPE. Resp., at 29. The plaintiffs maintain the items of PPE worn by Gary Works employees aren't "clothes" as that phrase was defined in 1957 when Section 203(o) was enacted, citing to Webster's Second New International Dictionary 507 (1957), which defined "clothes" as "[c]overing for the human body; vestments; venture; a general

_____

[5] In Opinion Letter FLSA 2002-2, the Wage and Hour Division of the DOL interpreted "clothes" under 29 U.S.C. § 203(o) to include "items worn on the body for covering, protection, or sanitation, but not to include tools or other implements such as knives, scabbards, or meat hooks." 2002 WL 33941766, p. 3 (June 6, 2002).

term for whatever covering is worn, or is made to be worn, for decency or comfort." According to the plaintiffs, "[w]hile protective equipment may cover the human body in a generic sense, such equipment is not worn 'for decency or comfort,' but rather as a component of the gear and equipment the worker must use to safely perform the tasks required of him by his employer." Resp., at 27-28.

The plaintiffs rely on the decision in Alvarez v. IBP, Inc., 339 F.3d 894, 905 (9th Cir. 2003), which viewed § 203(o) as an "exemption" to the FLSA that was to be construed narrowly against the employer. The Alvarez court viewed the specialized gear worn by employees of a meat slaughtering and processing plant – sanitary outer garments; hard hat; hair net; ear plugs; face shield or safety goggles; gloves; liquid-repelling sleeves; aprons; leggings; safety boots/shoes; weight-lifting type belts; chain-link (mesh) metal aprons, leggings, vests, sleeves, and gloves; plexiglass arm guards; Kevlar gloves; and puncture-resistant protective sleeves – as "different in kind from typical clothing" and held that "changing clothes means something different from donning required specialized personal protective equipment" 339 F.3d at 905. The plaintiffs say their PPE isn't worn for "decency or comfort" or as substitute clothing.

Recognizing the continuing disagreement about the proper interpretation of "changing clothes" under § 203(o),[6] the court finds persuasive the reasoning of

_____

[6] *Compare* Andrako v. United States Steel Corp., 632 F. Supp. 2d 398, 410 (W.D. Pa. 2009) (concluding that flame retardant jackets and pants, glasses, boots, snoods, and hard hats "unquestionably fall within . . . any common definition of the word 'clothes'"); Davis v. Charoen Pokphand (USA), Inc., 302 F. Supp. 2d 1314, 1321 (M.D. Ala. 2004) (finding hairnet, earplugs, boots, a smock, an apron, cotton gloves, rubber gloves, cutting gloves, arm guards, and plastic

Anderson v. Cagle's, Inc., 488 F.3d 945, 955-959 (11th Cir. 2007), and Andrako v. United States Steel Corp., 632 F. Supp. 2d 398, 407-410 (W.D. Pa. 2009), that the term "clothes" as used – but not defined – in § 203(o) should be given its ordinary, contemporary, common meaning, that is, as "covering for the human body or garments in general," as defined in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 428 (1986)). Anderson v. Cagle's, 488 F.3d at 955; Andrako v. USS, 632 F. Supp. 2d at 409. Thus, a determination of whether an item of protective gear should be considered "clothes" under § 203(o) depends on the exact nature of the item and the circumstances under which it is used. "A cloth jumpsuit, for instance, is probably clothing even if worn by a car mechanic as protection from oil and grease; a space suit is probably not clothing, even though it is a kind of protective outfit." Kassa v. Kerry, Inc., 487 F. Supp. 2d 1063, 1067 (D. Minn. 2007). Regardless of whether an item is labeled "'personal protective equipment' or something else, a hair net is still a hair net, pants are still pants, and a smock

---

sleeves qualified as clothes under § 203(o) in reliance on dictionary definition of "clothing" as "covering for the human body or garments in general"); Figas v. Horsehead Corp., No. 06-1344, 2008 WL 4170043, at *11 (W.D. Pa. 2008) (rejecting plaintiffs' claim that "all protective gear is outside the category of 'clothes' referenced in § 203(o)" as "inconsistent with the plain language of the statutory provision and the legislative intent reflected therein"); and Anderson v. Pilgrim's Pride Corp., 147 F. Supp. 2d 556 (E.D. Tex. 2001) (donning and doffing aprons, smocks, gloves, boots, hairnet, and earplugs not compensable), *with* Spoerle v. Kraft Foods Global Inc., 527 F. Supp. 2d 860 (W.D. Wis. 2007) (concluding that "clothes" refers only to "something the employee would normally wear anyway" or a replacement for such clothing and not "safety and sanitation equipment" that's "uniquely job-related" and "under the employer's control"); Gonzalez v. Farmington Foods, Inc., 296 F. Supp. 2d 912 (N.D. Ill. 2003) (donning and doffing of "sanitary and safety equipment," including a helmet, white smock, plastic apron, arm guard, belly guard, plastic arm sleeve, a variety of gloves, a hook, knife holder, a piece of steel to straighten the edge of a knife blade, and knives didn't constitute "changing clothes" under § 203(o)); and Perez v. Mountaire Farms, Inc., No. AMD 06-121, 2008 WL 2389798 (D. Md. June 10, 2008) (narrowly construing "clothes" as not including aprons, rain suits, cooler suits, gloves (rubber, chain, and wizard), arm guards or sleeves, goggles or safety glasses, boots, hair nets, beard nets, and bump caps).

is still a smock. Whether the items that plaintiffs don and doff are 'clothes' under § 203(o) depends on what those items *are*, not on what they are called by the CBA, by [the] plant manager, or by anyone else." Kassa v. Kerry, 487 F. Supp. 2d at 1066 (emphasis in original); *see also* Bejil v. Ethicon, Inc., 269 F.3d 477, 480 n.3 (5th Cir. 2001) ("nonsensical" to define "clothes" so narrowly as to exclude protective garments (lab coat, hair cover, facial hair cover, shoe cover) worn at plant).

USS has submitted for the court's review the items of PPE the company provides for its employees. *See* Kolb Decl., Exh. 4. Unlike the speciality items at issue in Alvarez v. IBP, 339 F.3d at 898 n.2, or those in Fox v. Tyson Foods, Inc., No. CV-99-BE-1612, 2002 WL 32987224, at *3 (N.D. Ala. Feb. 4, 2002) (which included plastic aprons, thin knit gloves, cotton liner gloves, rubber outer gloves, mesh or chain gloves, dust masks, plastic sleeve covers, and hard plastic arm guards), the cloth jacket and pants, fabric snoods, hoods, leggings, and wristlets, and boots here at issue easily fall within the ordinary definition of "clothes." *See* Andrako v. USS, 632 F. Supp. 2d at 410 (finding same items of USS protective gear to be "clothing": "by description, look, feel, purpose, fit, and basic common sense, the items at issue are 'clothes' within any reasonable meaning of Section 203(o)"); Figas v. Horsehead Corp., No. 06-1344, 2008 WL 4170043, at *11 (W.D. Pa. 2008) (the term "clothes" held to include flame-retardant jacket, pants, and/or coveralls, hard hat, and work shoes: "the adjective 'protective' does not deprive 'clothes' of their fundamental character"). And even if the court were to assume

14

that hard hats, safety glasses, and ear plugs aren't "clothes," *but see* <u>Reich v. IBP,</u>
<u>Inc.</u>, 38 F.3d 1123, 1126 n.1 (10th Cir. 1994) (requiring employees to put on
safety glasses, earplugs, and a hard hat "is no different from having a baseball
player show up in uniform, a businessperson with a suit and tie, or a judge with
a robe"), the time expended by each employee donning and doffing those items is
minimal, or de minimis, and thus not compensable under the FLSA. *See* <u>Kassa v.</u>
<u>Kerry</u>, 487 F. Supp. 2d at 1067 n.1 ("Hair nets and beard nets are . . . purely
functional and are not generally considered 'clothes' as that term is ordinarily
used. But the precise classification of hair nets and beard nets is not important
[because] donning and doffing those items alone is surely a *de minimis* activity.").

### (b) "Changing"

The plaintiffs further rely on WEBSTER'S SECOND NEW INTERNATIONAL
DICTIONARY 448 (1957) for a definition of "changing" – "to alter by substituting
something else for, or by giving up for something else . . . as, to change one's
clothes, one's occupation, or one's intention; to change cars or trains, partners,
sides, or parties" – and conclude that Gary Works employees don't "'change
clothes' . . . when they insert ear plugs, or put on hard hats, safety glasses, steel-
toed boots, snoods, hoods, leggings, wristlets, or a pair of work gloves, or don
flame retardant protective jackets and pants over their street clothes because such
acts do not involv[e] the substituting of clothing." Resp., at 28-29. The court can't
agree. "Nothing in the statute's language suggests that its application turns on

whether one must fully disrobe or exchange one shirt, for example, for another," Anderson v. Cagle's, 488 F.3d at 956, and the term "changing" can't be read so narrowly as to exclude the actions of the plaintiffs in donning and doffing the PPE they wear each day. *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 248 (1984) (defining "change" as: "To make different: alter; to give a totally different form or appearance to: transform). Even if each employee did nothing more than put the items of PPE over the clothing he or she wore to the plant, adding those items would satisfy the "change" requirement. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 373 (2002) (defining "change" as: "To make different: to make different in some particular but short of conversion into something else").

While the plaintiffs argue for a narrow construction of § 203(o), say the court should follow Alvarez v. IBP, 339 F.3d 894 (9th Cir. 2003), and reject Anderson v. Cagle's, 488 F.3d 945 (11th Cir. 2007), and claim the proper definition of "clothes" doesn't include protective clothing of any kind, they haven't applied their arguments to the specifics of this case. They haven't explained why the items of protective clothing they are required to wear aren't "clothes" or why their donning and doffing activities don't amount to "changing clothes," nor have they compared or contrasted their items of protective clothing with items at issue in other cases. The plaintiffs' legal conclusion that protective clothing doesn't qualify as clothing under § 203(o) doesn't provide "the specific substantiating facts require[d] under Rule 56 to create a genuine issue of material fact." Carter v.

American Oil Co., 139 F.3d 1158, 1162 (7th Cir. 1998). The court concludes USS has satisfied the first element under 29 U.S.C. § 203(o).

### 2.  Collective Bargaining Agreement/Custom or Practice

To prevail on its § 203(o) defense, USS must establish not only that the items at issue in this case are "clothes" – which it has done – but also that the applicable CBA contains express terms excluding compensation for changing clothes and washing or there is a "custom or practice" under the applicable CBA of not paying workers for those pre- and post-shift activities. The parties agree that Gary Works employees aren't now and have never been compensated for time spent donning and doffing protective gear and showering before their paid shifts begin or after the shifts end.[7]

USS maintains the terms of the parties' collective bargaining agreements have excluded compensation for changing clothes and showering since 1947 when the issue was first memorialized in the parties' Supplemental Agreement, which provides that employees won't be paid for "time spent in preparatory or closing activities on the employer's premises . . . for which compensation is not paid under present practices." Deft. App. 267-268. USS says the referenced "preparatory or closing activities" include the donning and doffing of work clothes and washing up, and the parties' re-adoption of the terms of the 1947

---

[7] All references to non-payment for"washing" or "showering" time recognizes the exception for Coke Plant employees who, pursuant to CBA provisions and local agreements and practices, are afforded wash-up time before the end of their paid shifts.

Supplemental Agreement in subsequent CBAs establishes that the parties intended a custom or practice of non-compensation to continue over the periods of those contracts, as well.

USS insists the 1947 Supplemental Agreement, which contains specific terms excluding compensation for these activities, has governed this issue since 1947. For example, USS says, the 1947 Supplemental Agreement was re-adopted in the 1999 CBA, which, in Appendix C, specifically affirmed that "understandings reflected in the prior Supplemental Agreement concerning so-called portal-to-portal claims are re-adopted" for the term of the agreement. Deft. App. 269-270. USS says the 1947 Supplemental Agreement was incorporated into the 2003 CBA because that CBA specifically required new or different practices or agreements to be in writing and no writing relating to these activities was signed during that time. Kolb Decl., ¶ 37. And, USS says, in 2008, the company and the Union agreed "that starting in 1947, every national collective bargaining agreement . . . negotiated by the parties has included an agreement that [USS] is not obligated to pay employees for preparatory or closing activities which occur outside of their scheduled shift or away from their worksite (i.e., so-called 'portal-to-portal activities') [including] donning and doffing of protective clothing (including such items as flame-retardant jacket and pants, metatarsal boots, hard hats, safety glasses, ear plugs, and a snood or hood) and washing up." Deft. App. 392.

USS also says the issue of non-compensation for the activities at issue has arisen in local bargaining and grievances over the years, as evidenced by a 1983

18

grievance filed by Local 1014 at USS's Gary Works plant based on the following claim: "At the present time we pick our time cards up at the gate, get on a bus, go to washhouse, change clothes and then go to line up area. We don't get paid until we get lined up." The grievance requested that USS "[p]ay portal to portal from gates." Deft. App. 271. USS says the union's request was denied. Kolb Decl., ¶ 38. USS says the issue of washing or showering time has been addressed by the parties over the years, as well, as evidenced by grievances filed by the union in 1974, 1977, 1980, 1983, and 1993 on behalf of employees in various departments of the Gary Works plant requesting that they be paid for time spent washing-up/showering at the end of their shifts. *See* Deft. App. 290-311. USS concludes that changing clothes and showering "are not now, and have never been, considered compensable time at any point at Gary Works." Kolb Decl., ¶ 37.[8]

Plaintiffs respond that the terms of the 1947 Supplemental Agreement aren't found in the 2003 CBA and can't be inferred as being applicable to the 2003 contract because, according to plaintiff Clifton Sandifer, the 2003 CBA "declared that its express terms constituted the 'full and complete understanding' between the parties. Sandifer Decl., ¶ 26. Mr. Sandifer's statement contains no reference or citation to the portion of the CBA upon which he relies. *See* Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument.").

---

[8] Mr. Kolb notes that local practices in the Coke Plant providing employees with wash-up time were allowed to continue under the 2003 CBA if the time provided didn't diminish productivity or interfere with the demands of the production schedule. Kolb Decl., ¶ 52.

Plaintiffs next claim that USS "essentially concedes" that no agreement regarding these issues existed from 2003 to 2008 because the 2003 CBA didn't incorporate the 1947 Supplemental Agreement. Resp., at 32. According to the plaintiffs, USS admitted that the 2003 CBA "specifically intended to terminate existing local agreements and practices and require that such agreements and practices be memorialized in writing in the future." Resp., at 31. The plaintiffs' claim in this regard finds no support in the cited section of USS's argument, *see* Deft. Memo., at 18[9], or in plain language of the applicable sections of the 2003 CBA. Section 5.A.6 of the 2003 CBA requires that "all future Local Working Conditions" – that is, those arising from 2003 forward – "be reduced to writing." Deft. App. 89. USS says the custom or practice here at issue has existed since 1947, so in 2003 the custom or practice wasn't a "future" local working condition that was required to be in writing. The 2003 CBA also provides in Section 5.A.7 that "any Local Working Condition established prior to May 20, 2003 that would interfere with the attainment of the workplace restructuring objective" would be eliminated and those local working conditions unaffected by the workplace restructuring plan "will be preserved." The plaintiffs haven't alleged or argued that the local working condition of non-payment for changing clothes and showering

---

[9] USS presented the following argument on this point: "In 2003, the [Union] and [USS] entered into the current [CBA], which, while not expressly referring to the 1947 Supplemental Agreement, made it clear that the decades-old custom and practice of not paying for preparatory and closing activities that occur outside of the paid shift would remain in effect. In fact, the parties to the 2003 [CBA] went even further and provided that *any* then existing local agreement or practice that could diminish productivity would be terminated and that any new local agreement, custom or practice to the contrary had to be in writing, signed and approved at the national level. No such written agreement has been signed by the parties." Deft. Memo., at 18.

was eliminated because it interfered with USS's Workplace Restructuring and Productivity Plan or that that local working condition wasn't preserved over the effective period of the contract.

Plaintiffs say, too, that it isn't enough that an employer has a custom or practice of not paying for time spent on the activities here at issue: use of the phrase "a custom or practice under a bona fide collective-bargaining agreement" in Section 203(o) requires the custom or practice to have a relationship with or arise under the auspices of the CBA. The plaintiffs contend "[t]he practice need not have been memorialized within the text of the CBA, but the issue must at least have arisen as part of the CBA negotiation process, such that the CBA's failure to address the question can fairly be attributed to the union's decision to acquiesce to the employer's practice." Resp., at 34. Plaintiffs claim that no custom or practice can exist under the 2003 CBA as evidenced by plaintiff Clifton Sandifer's statement that "[t]he CBA, which governed compensation at the time this suit was filed, did not address compensation for the activities at issue in this case. Nor was the issue discussed during the negotiations leading to that contract." Sandifer Decl., ¶ 26. Mr. Sandifer, though, hasn't set forth any information about his personal knowledge of the 2003 contract negotiations. He reports that from June 2006 to September 2008 he was Chairman of the Civil Rights Committee and in that capacity became familiar with the union grievance process and some of the grievances filed against USS, but he hasn't stated that he had any involvement in the 2003 contracts talks, was a member of the union's bargaining committee in

2003, or personally participated in or even attended the 2003 negotiation sessions in any capacity. Mr. Sandifer's unsupported statement that "the issue" wasn't discussed during the 2003 contract negotiations, without more, is insufficient to create a genuine issue of material fact as to whether a custom or practice exists under the 2003 CBA. *Cf.* Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 563 (7th Cir. 1998) (affirming summary judgment where affidavit claiming that management knew of offensive photographs in the workplace didn't include any specifics about who complained, to whom the complaints were made, the nature of the complaints, or how the affiant gained personal knowledge of the complaints); Hadley v. County of DuPage, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

Plaintiffs lastly argue that the five-year span of the 2003 CBA – from 2003 to 2008 – is too short a period of time to establish a custom or practice, claiming that "a custom or practice in the FLSA context may not be found when a history of discord exists, as it does here." Resp., at 36. The plaintiffs cite language from Tennessee Coal v. Muscoda, 321 U.S. at 602, that "[a] valid custom cannot be based on so turbulent and discordant a history; it requires something more than unilateral and arbitrary imposition of working conditions." They further claim that the "issue of compensation for clothes changing need not be 'threshed out' between the union and the employer – it is enough the employer was unilaterally

22

refusing to pay for the activity at the time the CBA was entered into." Resp., at 37. But plaintiffs have offered no explanation as to the applicability of that language to the facts of this case nor have they set forth any evidence demonstrating that the issue at hand wasn't "threshed out" between USS and the Union during contract negotiations and grievance procedures. *See* Davis v. Carter, 452 F.3d 686, 692 (7th Cir. 2006) (court is not required to "scour a record to locate evidence supporting a party's legal argument" nor "research and construct the parties' arguments."); Roger Whitmore's Auto. Servs., Inc. v. Lake County, IL, 424 F.3d 659, 664 n.2 (7th Cir. 2005) ("It is the parties' duty to package, present, and support their arguments.").

USS has submitted evidence it says demonstrates the parties' continuing agreement to non-compensation for the activities here at issue – language in the 1947 Supplemental Agreement; inclusion of that agreement in the 1999 and 2008 CBAs; language in the 2003 CBA preserving prior local working condition agreements (like the 1947 Supplemental Agreement) and requiring new local working condition agreements to be in writing (there were none); and a custom or practice of non-payment for these activities. The plaintiffs haven't challenged USS's evidence that the issue of non-compensation has been addressed and agreed to between the company and the union since 1947, nor have the plaintiffs presented evidence of their own demonstrating a history of what they refer to as "unilateral and arbitrary" imposition of working conditions, i.e., non-compensation for pre- and post-shift activities of changing clothes and showering, that would

23

negate the terms of the parties' written agreements or create a genuine issue as to whether a custom or practice of non-compensation has existed in connection with the parties' bona fide collective-bargaining agreements since 1947. USS has carried its burden under 29 U.S.C. § 203(o), and the company's summary judgment motion is granted with respect to plaintiffs' claim for compensation for time spent donning and doffing PPE and showering.

### B.   29 U.S.C. § 254(a) – Portal-to-Portal Act

USS next claims the plaintiffs' claims are barred under the Portal-to-Portal Act, which exempts employers from paying employees for (1) "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities" the employee was hired to perform and (2) engaging in activities that are "preliminary to or postliminary to [the employee's] principal activity or activities" if those activities occur either prior to the commencement of or subsequent to ceasing of the principal activity or activities on any particular workday. 29 U.S.C. § 254(a). "Principal activity" isn't defined in the statute, but the term has been interpreted as including all activities that are an "integral and indispensable part of the principal activities" for which the employees are employed. Steiner v. Mitchell, 350 U.S. 247, 252-253 (1956). "To be 'integral and indispensable,' an activity must be necessary to the principal work performed and done for the benefit of the employer." Alvarez v. IBP, 339 F.3d at 902-903. "In contrast to integral and indispensable activities, preliminary or postliminary activities are

24

activities spent predominantly in the employees' own interests." <u>Jerzak v. City of South Bend</u>, 996 F. Supp. 840, 848 (N.D. Ind. 1998). "The test, therefore, to determine which activities are 'principal' and which are 'an integral and indispensable part' of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business." <u>Dunlop v. City Elec., Inc.</u>, 527 F.2d 394, 400-401 (5th Cir. 1976); *see also* 29 C.F.R. § 790.7(b) ("No categorical list of 'preliminary' and 'postliminary' activities . . . can be made, since activities which under one set of circumstances may be 'preliminary' or 'postliminary' may under other conditions be 'principal' activities."). USS's arguments will be addressed separately.[10]

## 1.  Interaction with 29 U.S.C. § 203(o)

USS's first argument is that donning and doffing PPE and showering can't be considered principal activities because those activities are non-compensable under 29 U.S.C. § 203(o). USS says changing clothes and showering aren't parts of employees' measured working time, so the activities don't start or end the

---

[10] USS also argued that the plaintiffs' walking time is non-compensable pursuant to the terms of the applicable CBA, a fact the company says the court "should weigh – heavily" because the "Portal-to-Portal Act expressly requires consideration of the parties' collective bargaining agreements to determine whether employers must pay employees for preliminary and/or postliminary activities." Reply, at 16. This argument was raised for the first time in USS's reply brief, so the company's argument in this regard is waived. *See* <u>United States v. Williams</u>, 436 F.3d 767, 769 (7th Cir. 2006) ("the defendant has waived this argument because he presented it for the first time in his reply brief"); <u>Hart v. Transit Mgmt. of Racine, Inc.</u>, 426 F.3d 863, 867 (7th Cir. 2005) ("Arguments that first appear in a reply brief are deemed waived.").

workday and can't be considered principal activities. Thus, USS says, walking to and from the locker rooms doesn't occur after the beginning of the first principal activity of the day or before the end of the last principal activity, rendering that walking time non-compensable under the Portal-to-Portal Act. USS says its position is supported by the Department of Labor's opinion that

> In promulgating [§ 203(o)] Congress plainly excluded activities covered by section [203(o)] from time that would otherwise be 'hours worked.' Accordingly, activities covered by section [203(o)] cannot be considered principal activities and do not start the workday. Walking time after a [§ 203(o)] activity is therefore not compensable unless it is preceded by a principal activity.

DOL Opinion Letter FLSA 2007-10, 2007 WL 2066454, at *1 (May 14, 2007).

Courts are to afford consideration to agency opinion letters interpreting the statutory provisions within the agency's area of expertise, *see* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) ("[T]he rulings, interpretations and opinions of the [DOL] under [the FLSA], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment as to which courts and litigants may properly resort for guidance."); CenTra, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 578 F.3d 592, 601 (7th Cir. 2009) ("Opinion letters are not entitled to *Chevron* deference, or even the deference we accord an agency's interpretation of its own ambiguous regulation, . . . but opinion letters are 'entitled to respect . . . to the extent that [they] have the power to persuade.'"(*quoting* Christensen v. Harris County, 529 U.S. 576, 587 (2000)), but, in this instance, the DOL's 2007 FLSA Opinion Letter provides little

guidance on the reason(s) for the agency's conclusion on this issue. The court finds more persuasive the conclusion of the <u>Figas</u> court that "the *character* of donning and doffing activities is not dependent upon whether such activities are excluded pursuant to a collective bargaining agreement." <u>Figas v. Horsehead Corp.</u>, No. 06-1344, 2008 WL 4170043, at *20 (W.D. Pa. Sept. 3, 2008) (emphasis in original). "Section 203(o) relates to the *compensability* of time spent donning, doffing, and washing in the collective bargaining process. It does not render such time any more or less integral or indispensable to an employee's job." <u>Andrako v. USS</u>, 632 F. Supp. 2d at 413 (emphasis in original). Accepting USS's argument and the conclusion of the Opinion Letter on this issue would necessarily "expand § 203(o)'s exclusion beyond donning, doffing and washing time to include post-donning and pre-doffing travel time, which is not mentioned therein." <u>Figas v. Horsehead Corp.</u>, 2008 WL 4170043, at *20. The court can't conclude as a matter of law that the non-compensability of donning, doffing, and showering activities under 29 U.S.C. § 203(o) excludes consideration of whether, pursuant to 29 U.S.C. § 254(a), those activities are an integral and indispensable part of employees' principal activities at USS. *Contra* <u>Sisk v. Sara Lee Corp.</u>, 590 F. Supp. 2d 1001, 1011 (W.D. Tenn. 2008) (concluding that "once an activity has been deemed a section [203(o)] activity, it cannot be considered a principal activity. This finding is in accordance with the 2007 DOL opinion letter, which the court has already determined worthy of deference, stating that a section [203(o)] activity is not a principal activity. . . . Therefore, to avoid the preclusive effect of the

combination of section [203(o)] and the continuous workday rule, plaintiffs must show that their claimed activities are themselves either principal activities or are integral or indispensable to a principal activity.").

## 2.  Integral and Indispensable

USS next asserts that the activities here at issue – donning and doffing, showering, and the laundering of employees' personal clothing – aren't "integral and indispensable" parts of the employees' principal activities because those activities aren't necessary to employees' performance of their principal activities and aren't undertaken for the sole benefit of the company. The company's arguments relating to each activity will be addressed separately.

### (a) Donning and Doffing of PPE

USS says that based on differing job assignments within the plant, not all employees are required to wear PPE – for example, as a Bander in the Hot Roll finishing department, plaintiff Alvin Mitchell wasn't required to wear greens, although he chose to do so. *See* Burton Decl., ¶ 3 [App. 339-340]. USS says, too, that wearing greens isn't necessary to the performance of the principal activities of certain jobs – for example, wearing greens isn't necessary for plaintiffs Dora Anderson and Kenny Williams to monitor temperatures and opacity gauges in their positions as Heaters in the Coke Plant, even though, USS notes, wearing greens was required for that position. Deft. Memo., at 25. USS asserts that even

28

though wearing PPE at Gary Works unquestionably advances the company's core value of maintaining a safe work environment, "that interest is not for the exclusive benefit of the employer. Wearing greens clearly serves the mutual interest of the employer and the employee to avoid accidents and to work in the safest environment possible." Deft. Memo., at 26. USS maintains that donning and doffing of generic work clothes isn't an integral and indispensable part of principal activities at the plant because the donning and doffing of PPE isn't necessary to the principal work performed by employees and isn't done for the sole benefit of the company. Donning and doffing, USS concludes, are preliminary and postliminary activities and, therefore, walking from the locker rooms to the employees' place of principal activity and back to the locker room after employees cease their principal activities is not compensable under the Portal-to-Portal Act.

Plaintiffs respond that donning and doffing PPE is integral and indispensable to the principal work activities at the plant: they insist they wear PPE because doing so is required by USS and OSHA and the use of PPE "prevents workplace injuries, which would severely impeded USS's business." Resp., at 44. The plaintiffs, though, haven't challenged USS's claim that some job assignments don't require employees to wear PPE, that wearing PPE isn't necessary for some employees to perform their jobs, or that the wearing of PPE serves the mutual safety interests of the company and the employees. Plaintiffs cite Coke Plant regulations relating to the wearing of flame-retardant clothing, *see* Resp., at 38-39 (citing to "29 CFR § 1910.1029 et al."), but haven't referenced specific USS rules

or OHSA regulations that address the PPE they are required to wear. The plaintiffs cite generally to USS handbooks and safety manuals – for example, plaintiffs set forth the booklet explaining USS's Personal Protective Equipment Program, which provides that management personnel must assure that "*affected employees* use PPE," at p. 1 (emphasis in original), "*[a]ffected employees* shall wear the required PPE for the area(s) where they are working," at p. 2 (emphasis in original), and "[a]fter training, *affected employees* will be able to independently determine when and what PPE is necessary in their normal workplace," at 3 (emphasis in original), *see* Walton Decl., Exh. B – but they haven't pointed to specific provisions of those materials that designate the PPE they are required to wear or explained how the PPE they wear is necessary to their performance of their job tasks.

The changing of clothes is integral and indispensable to an employee's principal activities if the donning is "necessary to the principal work performed and done for the benefit of the employer." Alvarez v. IBP, 339 F.3d at 903; *see also* Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944) ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."); Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir. 2004) (changing clothes may be considered integral and indispensable "where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work"). The parties' evidence establishes that Coke Plant employees are required to wear PPE, and USS has set forth evidence that at least one plaintiff not working

30

in the Coke Plant isn't required to wear PPE and the requirement to wear PPE isn't vital to the performance of at least one job assignment in the Coke Plant. But viewing that evidence in the light most favorable to the plaintiffs as the court is required to do at this stage of the proceedings, the court concludes that USS hasn't established that the donning  and doffing of PPE isn't an integral and indispensable part of the principal activities at USS. The court agrees with USS that the safety advantages associated with the wearing of PPE is of mutual benefit to the company and the plaintiffs; however, a reasonable fact-finder could conclude that the donning and doffing of PPE is necessary to the principal work performed by the plaintiffs. The company's request for summary judgment on this issue is denied.

### (b) Showering

USS maintains the company has no requirement that employees working in areas other than the Coke Plant must shower at the end of their shifts and those who do shower before leaving the plant do so for their own convenience. USS says the applicable CBAs contain a recognition of the shower requirement for Coke Plant employees and the parties' agreement that those employees are to be afforded time to shower before the end of their paid shifts, but "[e]xcept for employees at the Coke Plant, there is no requirement whatsoever that any employee wash up or shower after the end of his shift. While U.S. Steel does provide and maintain numerous wash houses and locker rooms throughout the

plant, whether an employee elects to wash up or shower is the employee's decision and for his own convenience." Kolb Dec., ¶ 48.

USS sets forth additional statements by supervisory employees relating to showering requirements at the plant:

– Declaration of Donald G. Ramsey, Jr. that there is no showering requirement for people holding position of Stock Unloader on Hi-Line, including plaintiff Nicole Andrews; Mr. Ramsey reports he's been working at USS since 1998 and is currently a Process Coordinator on the Hi-Line. *See* Deft. App. 370-371.

– Declaration of James Lash, who has worked at USS since 1998, is currently Steel Coordinator on No. 1 BOP, and says there's no requirement that Pit Utility employees, like plaintiff Bernard Jenkins, shower at the end of their shifts. *See* Deft. App. 349-353.

– Declaration of Nicholas Furdeck, who became employed at USS in 1998, is the current Pit Coordinator and Interim Area Manager for the Q-BOP, and says that USS has no requirement for employees at the Q-BOP, like plaintiff Bernard Jenkins, to shower at the end of their shifts. *See* Deft. App. 341-347.

– Declaration of Michael Burton, who has worked at USS since 1999 and was Shift Manager at EGL until December 2007 when he became Shift Manager at South Sheet Metal Warehouse, and says there's no requirement

32

that employees at EGL, like plaintiff Alvin Mitchell, shower at the end of their shifts. *See* Deft. App. 339-340.

– Declaration of Gregory Olson that USS has no requirement that employees working as Banders and Diesel Burners, like plaintiff Alvin Mitchell, shower before they leave the plant; Mr. Olson reports he began working at USS in 2000 and is currently Shift Manager in Hot Roll Finishing. *See* Deft. App. 355-358.

– Declaration of David Best, who began employment at USS in 1994, is currently Hot Strip Mill Coordinator, and states that there's no requirement that employees, like plaintiff Clifton Sandifer, who work in the Hot Strip Mill shower at the end of their shifts. *See* Deft. App. 334-338.

USS concludes that because showering isn't required and inures to the benefit of the employees, that activity isn't an integral and indispensable part of employees' principal activities and is non-compensable time under the Portal-to-Portal Act.

While plaintiffs claim that showering is "mandatory" under USS policies and OHSA requirements and the requirement for them to shower before they leave the plant benefits the company, they have produced no evidence to support their claim nor have they challenged the statements of USS supervisory personnel that no showering requirement exists outside the Coke Plant. Plaintiffs' conclusory statements, without more, are insufficient to create a genuine issue of material fact relating to the issue of showering.

USS has presented evidence sufficient to establish that, with the exception of Coke Plant employees, showering isn't otherwise required by the company and shower facilities are located in the locker rooms at the plant for the convenience of the employees. The court concludes that showering constitutes a postliminary activity under 29 U.S.C. § 254 for which USS isn't required to compensate its employees. USS is entitled to summary judgment on this issue.

(c) Laundering Personal Clothing

USS also asserts that the plaintiffs aren't entitled to be paid for time spent transporting and laundering the personal clothing they wear under their PPE because that time doesn't qualify as "work" and so is not compensable under the FLSA. USS says the plaintiffs' washing of their personal clothing isn't "necessarily and primarily for the benefit" of the company, USS derives no benefit from employees wearing clean personal clothing under their PPE, and USS has no requirement that employees' personal clothing be laundered or cleaned.

Because the term "washing" as used in Section 203(o) can't be seen as including laundering clothes, *see* Burks v.  Equity Group-Eufaula Div., LLC, 571 F. Supp. 2d 1235, 1243-1244 (M.D. Ala. 2008) (noting that "the vast majority of cases that have specifically discussed 'washing' in the context of § 203(o) have done so only in the context of washing one's body" and "the legislative history of 203(o) indicates that the term 'washing' was intended to be limited to cleaning the person"); Saunders v. John Morrel & Co., No. C88-4143, 1991 WL 529542, at *4

(N.D. Iowa Dec. 24, 1991) (same), USS is entitled to summary judgment only if the plaintiffs' laundering activity can be excluded from coverage as a "preliminary or postliminary" activity under 29 U.S.C. § 254(a)(2). Thus, the court must determine whether plaintiffs' laundering of their personal items of clothing is (I) required by USS, (ii) necessary for the plaintiffs to perform their duties, and (iii) primarily for the benefit of USS. <u>Bonilla v. Baker Concrete Const., Inc.</u>, 487 F.3d 1340, 1344 (11th Cir. 2007); <u>Jerzak v. City of South Bend</u>, 996 F. Supp. 840, 848 (N.D. Ind. 1998).

The plaintiffs claim that their laundering of personal work clothes is compensable under the FLSA in reliance on <u>Bull v. United States</u>, 68 Fed. Cl. 212 (Fed. Cl. 2005), where the court held that off-duty laundering of canine training towels was of benefit to the employer and integral and indispensable to the canine handlers' job duties. Plaintiffs say USS dictates the type of clothing they must wear under their PPE and the methods they must use to launder that clothing; they say, too, that OSHA regulations, *e.g.* 29 C.F.R. § 1910.1018, require USS to provide for the cleaning of chemically contaminated clothing, "including shoes and underwear."[11] The plaintiffs maintain their clothing is regularly contaminated with

---

[11] The plaintiffs cite generally to 29 C.F.R. § 1910.1018, which relates to "occupational exposures to inorganic arsenic" and outlines the obligations of employers in maintaining workplaces where such exposure might occur. The plaintiffs haven't specified any applicable section(s), but upon examination of the regulation, the court found the following references to the care of clothing for employees working in affected areas: employers are required to provide employees working in regulated areas with protective work clothing and equipment; launder that protective clothing "at least weekly," repair or replace protective clothing as needed; assure that contaminated protective clothing is placed in a closed container in the changing rooms; inform any person who cleans or launders the protective clothing of the harmful effects of exposure to inorganic arsenic; prohibit the removal of inorganic arsenic from protective clothing by shaking or

chemicals so USS benefits directly by requiring them to personally launder that clothing.

Plaintiffs' laundering claim relates to the personal items of clothing they wear each day.[12] The plaintiffs first say that USS dictates the clothing they must wear under their PPE, as well as the manner in which they must launder that clothing, and that transporting and laundering of those personal items of clothing "is done under the express direction of USS," citing to unidentified sections of Exhibits 1-37. But unlike the situation in <u>Bull v. United States</u> where the evidence – specific portions of a handbook and a written memo – established that the canine training towels were required to be properly cleaned "after each use," 68 Fed. Cl. at 238, the plaintiffs' conclusory statements in Exhibits 1-37, without citation to any evidence that would support their claims, that they are "required" by USS to transport and launder their personal clothing, are insufficient to establish that USS requires its employees to launder their personal clothing. *See* <u>Ammons v. Aramark Uniform Servs., Inc.</u>, 368 F.3d 809, 817-818 (7th Cir. 2004) ("Citations to an entire transcript of a deposition or to a lengthy exhibit are not

---

blowing;  provide changing rooms with separate storage facilities for street clothes and protective clothing; and provide facilities for employees to vacuum their protective clothing and shoes before entering other areas of the workplace. *See* § 1910.1018(j), (m). 29 C.F.R. § 1910.1018 contains no requirement that an employer affected by this section provide laundering services for employees' personal clothing or reimburse employees for laundering their personal clothing.

[12] While the plaintiffs say USS provides employees with instructions on how to clean the flame retardant PPE and claim the company "required employees to launder their contaminated PPE in a certain manner," Stmt. of Genuine Issues, ¶ 8, the record establishes that USS supplies, maintains, and launders the flame retardant PPE worn by all employees. The plaintiffs have presented no evidence to support a finding that they are or were required to launder the flame retardant PPE supplied by the company.

specific and are, accordingly, inappropriate. A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."). The plaintiffs have provided no support for their conclusory statement that USS "directly benefits by requiring plaintiffs to take home and launder" their personal clothing, and they haven't alleged or argued that the transporting and laundering of their personal clothing is necessary for them to perform their duties.

USS provides employees with PPE, flame retardant apparel that the company launders and maintains. The company's Gary Works "Personal Protective Equipment Program" manual states that personal clothing worn beneath the PPE "should be 100% cotton" and directs that no synthetic material clothing, e.g., nylon, dacron, rayon, polyester, etc., be worn under the PPE because such material will "burn at lower temperatures, melt and stick to the skin." The "General Safety and Plant Conduct" manual instructs that work clothing shouldn't be laundered or washed "in flammable liquids, such as gasoline, kerosene, or similar fluids, as the cloth may retain a part of the solution and become highly flammable," and further advises that flame-retardant clothing "should be cleaned by washing, using normal wash, rinse and drying cycles at normal temperatures, and using a normal household detergent as the cleansing agent, [and] to avoid impairing the flame-resistant properties, such clothing should never be boiled or steam cleaned, and solvents or bleaches should never be used."

While employees at Gary Works are prohibited from wearing items of personal clothing that would "melt and stick to the skin" and are provided with information about how to safely launder their personal work clothes and any flame-retardant clothing they might choose to wear under the company-provided PPE, neither that prohibition nor the accompanying safety instructions transform the transporting and laundering of plaintiffs' personal clothing into a requirement of USS that is necessary for the plaintiffs to perform their duties or that is primarily for the benefit of USS. USS is entitled to summary judgment on the plaintiffs' laundering claim.

### C. Time Expended is De Minimis

USS maintains the time spent by the plaintiffs donning and doffing PPE and walking to and from the job site is *de minimis* and not compensable under the FLSA. "Because defendant seeks to rely on an exception to the rule, it is the defendant's burden to prove that the exception applies." Spoerle v. Kraft Foods Global, Inc., 527 F. Supp. 2d 860, 868 (W.D. Wis. 2007).

"The *de minimis* doctrine permits employers to disregard, for purposes of the FLSA, otherwise compensable work '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.'" Singh v. City of New York, 524 F.3d 361, 370-371 (2d Cir. 2008) (*quoting* Anderson v. Mt. Clemens Pottery Co.,

328 U.S. 680, 692 (1946)). Determination of whether the *de minimis* exception is applicable requires the court to examine four factors. <u>Hoyt v. Ellsworth Co-op Creamery</u>, 579 F. Supp. 2d 1132, 1138 (W.D. Wis. 2008). The first factor is "the amount of daily time spent on the additional work;" the second is "the practical administrative difficulty of recording the additional time;" the third is "the aggregate amount of compensable time;" and the final factor is "the regularity of the additional work." "Although many courts have found daily periods of approximately 10 minutes to be *de minimis*, no rigid rule using mathematical certainty should be applied. Instead common sense must be applied to the facts of each case." <u>Hoyt v. Ellsworth Creamery</u>, 579 F. Supp. 2d at 1138; *see also* 29 C.F.R. § 785.47 ("In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are *de minimis*. . . . This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.").

With respect to the amount of daily time expended, USS says donning the required PPE takes approximately 2 minutes, 40 seconds, as demonstrated in its

video presentation submitted as Exhibit 1 to Raul Arana's Declaration [Deft. App. 323-333]. USS says while the walking distances from locker rooms to work locations "vary widely," estimates are between 1 minute, 38 seconds and 8 minutes. Deft. Memo., at 30. USS notes, too, that walking times are often reduced when employees are allowed to walk back to the locker rooms during their paid shifts. Doffing work clothes is alleged to take even less time than putting them on. Deft. Memo., at 30.

USS claims difficulty would arise under the second factor if the company had to record the additional time. USS contends that "[t]he time employees spend engaging in all of these pre- and post-shift activities cannot be administratively tracked. Employees are paid by shift, and customs and practices are prevalent throughout the plant pursuant to which employees are permitted, when the production or work schedule permits, to leave the work station early such that some doffing, walking, and washing will occur prior to the end of their paid shifts." Deft. Memo., at 30. USS has set forth affidavit statements that the time spent on these pre- and post-shift activities "varied by day and by employee. This is a personality driven thing. Some guys like to get to work early and read the paper. Some guys like to walk slow and chat with friends. It just varies." Lash Decl., ¶ 7 [Deft. App. 351].

USS maintains the aggregate amount of time expended is *de minimis.* According to the company, "[t]he variations among employees and units, and generally the small amounts of time expended pre and post shift, make each of

40

these activities *de minimis* and, thus, non-compensable." Deft. Memo., at 30-31. And while USS didn't address the last factor, the additional time expended on donning, doffing, and walking is clearly "regular."

The plaintiffs argue in response that the *de minimis* rule "applies to the aggregate amount of time for which an employee seeks compensation, not separately to each discrete activity." Resp., at 48. According to the plaintiffs, donning, doffing, and walking are all principal activities covered by the FLSA, so the measurement of time must be in the aggregate for purposes of the *de minimis* doctrine – "work cannot be parsed into discrete activities for measurement." Resp., at 48. Plaintiffs say their position is supported by the DOL's Wage and Hour Advisory Memorandum No. 2006-2, dated May 31, 2006, which interprets the decision in <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21 (2005), as "clearly stand[ing] for the proposition that where the aggregate time spent donning, walking, waiting, and doffing exceeds the <u>de minimis</u> standard, it is compensable. Any other conclusion would be inconsistent with the continuous workday rule." Pltf. Exh. 39, at 4. Plaintiffs have also offered suggestions of ways USS might better measure the time spent by employees on these activities so employees could be compensated on a weekly basis for the time. *See* Resp., at 50.

The parties seem to agree that the time spent on these activities varies from person to person and from activity to activity, but they offer widely differing estimates as to the amount of time required to complete the activities and dispute the feasibility of measuring that time for purposes of determining the amount of

compensation that might be required. Questions of fact preclude summary judgment on this issue.

### D. Mandatory CBA Grievance and Arbitration Procedures

USS lastly moves for summary judgment on the plaintiffs' claims because, the company says, all disputes arising under the CBA must be resolved through the procedures set forth in the CBA. USS says the "Adjustment of Grievances" section of the 2003 CBA provides a specific three-step grievance procedure that must be employed to settle "any differences . . . between [USS] and the Union as to the interpretation or application of, or compliance with, the provisions of this or any other Agreement between [USS] and the Union." Deft. App. 111-131.

This same argument was considered and rejected earlier this year by the court in <u>Andrako v. USS</u>, 632 F. Supp. 2d at 414, and that court's conclusion is equally applicable here: "Plaintiffs' claim for compensation for walking time does not rest on an interpretation of the underlying collective bargaining agreement. Rather, plaintiffs argue that regardless of what the collective bargaining agreement provides, the FLSA entitles them to compensation for post-donning and pre-doffing walking time as a matter of law. This is a question of statutory, not contractual, interpretation." USS's request for summary judgment based on the grievance and arbitration procedures of the applicable CBA is denied.

### IV. Conclusion

42

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART the defendant's motion for summary judgment [docket # 82] in the following particulars:

(a) USS's request for judgment pursuant to 29 U.S.C. § 203(o) with respect to plaintiffs' claim for compensation for donning and doffing PPE and showering is GRANTED;

(b) USS's request for judgment pursuant to 29 U.S.C. § 254(a) is

(1) GRANTED with respect to plaintiffs' claims related to showering and laundering, and

(2) DENIED with respect to plaintiffs' claim related to walking time;

(c) USS's request for judgment based on the *de minimis* doctrine is DENIED; and

(d) USS's request for judgment pursuant to the grievance and arbitration procedures of the applicable CBA is DENIED.

SO ORDERED.

ENTERED:   October 15, 2009


  /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

43